Let's just let everyone get settled for a minute. Okay, Mr. Stolle. May it please the court, I'm Scott Stolle on behalf of American Honda Motor Company. Every expert opinion starts as ipsy-dixit. It starts with an expert saying, take my word for it, trust me, I'm an expert. Daubert said, that's not good enough. And ever since Daubert, the fight has been over what is sufficient support behind an expert's ipsy-dixit to elevate it to probative evidence. In Casey v. Toyota, this court faced that question. The expert there did not perform a risk-utility analysis of the proposed alternative airbag. He didn't do any testing to show that his alternative would have produced a better outcome. Instead, he relied on a patent application. This court held that the patent application was insufficient support. The patent application itself had no risk-utility analysis of the proposed alternative as installed in the vehicle in question. And the patent application was not conducted with testing conditions. The court said the testing conditions in the patent application were too far afield to show there would have been a better outcome in this particular crash. So the court held that the expert opinion in Casey v. Toyota was no evidence of a safer alternative design. It was only ipsy-dixit. It was never elevated to probative status. Another way to look at that is there was too great an analytical gap between the expert's theory that a different airbag material would have worked and the actual accident conditions. The patent application did not bridge that analytical gap. The expert's ipsy-dixit didn't bridge the gap. And the jury couldn't bridge that gap on its own. This case is similar. Plaintiff's counsel here didn't just point to one exhibit, the patent application. They pointed to multiple demonstrative exhibits. It was a form of laundry list persuasion. So in Casey, what the court had was one piece of dirty laundry. Here what we have is a pile of dirty laundry. We have a pile of demonstrative exhibits, which by the way are not substantive evidence. But this pile does not contain a risk utility analysis of the proposed alternatives as installed in the vehicle in question. And they do not contain testing that was performed under similar conditions to show that there would have been a better outcome in this accident. Because you see, dirty laundry is not additive. You don't make it better by adding more dirty laundry. And you cannot camouflage it by calling it, quote, engineering judgment. All that is is a euphemism for saying ipsy-dixit. So the plaintiff's effort here- You have to show abuse of discretion here, don't you? Only on the admission of- Excuse me. By a very experienced trial judge. That would be on the motions to exclude. Yes, Your Honor. It is an abuse of discretion standard. But one of the points we make with respect to the argument about the Daubert motions is it never should have gone to trial. Because there was never any probative evidence to support the experts. In fact, the trial judge didn't even go through a Daubert analysis. He wrongly concluded that the motions went to the merits when they didn't. They went to the relevance and reliability of the expert opinions. And this court has said if the opinion is not relevant, if the opinion is not reliable, it is not evidence. So we can just skip over the Daubert question and get to the trial. The evidence presented at trial was not relevant and reliable. It is not evidence. Is the automotive literature on testing reverse geometry belts with a load limited without serious neck injuries, is that evidence in this case? No. Is the automotive literature, I'm sorry, is the Honda's internal documents, which shows that a particular type of seat belt would be effective, means to prevent far side impacts, is that evidence in this case? No, because we've Was that presented at the Daubert hearing, those two things? I don't believe so, Your Honor. I can't remember for sure, but I don't believe so. So neither of those things are in the Daubert? Not that I recall. Or the testimony at the trial? There was only, at the Daubert stage, there was each expert's CV, each expert's report, and about 55 pages of deposition testimony. But when we get to trial, Your Honor, there is no testing under similar conditions as this accident to show that the outcome probably would have been better under the conditions of this accident. And one reason there is no such testing is the plaintiff's experts never proposed an actual design, either for the reverse seat belt or the center airbag. All they presented was a concept. They didn't have a design they could test. Even if they wanted to try to test it, to demonstrate it would have produced a better outcome in this case, they couldn't. They didn't have a design to test. Well, I thought it, as I read the record, it was pretty simple to put in one additional strap, et cetera. I didn't see that to be a complicated cure. And it was the simplicity of the cure and the disastrous consequences of not having it that the plaintiff accented at trial, as I understood it. And is Your Honor talking about the reverse geometry seat belt? Well, first of all, it's a very intricate thing to introduce a new safety device in an automobile because you have the seat belt, you have the attachment points, you have the strength of the webbing, the elasticity of the webbing. There's evidence that that particular device is used by other manufacturers. The device meaning which, Your Honor? Reverse belt, the belt. It has been used in rear seat environments, which is a different environment. I'm sorry? It's in the rear seat environment, which is a different environment than in the front seat. So, you've got multiple devices in the seat belt. You've got a pretensioner, which prevents spooling out. You have a load limiter, which allows spooling out. You've got an intricate dance between these things. They never proposed a design for that. More importantly, perhaps, Your Honor, is they never dealt with the most important risk that that seat belt posed, which is as that driver moves toward the right, he's going to get garroted by that shoulder strap that's been reversed. Mr. Hanneman, the plaintiff's expert, admitted that's going to impose about 3,400 pounds of force on his neck. And he admitted that's the biggest risk of that option. And when he was asked, what about that load? What about that big risk of garroting on his neck? His answer was, this is at page 2884, that's a biomechanic issue. I wouldn't have an opinion on that. Their design expert couldn't assess the biggest risk of that alternative. If he can't assess the biggest risk, he cannot assess the overall risk. So, he did know, he disqualified himself from ever doing a risk utility analysis. Now, he was trying to punt the ball back to Mr. Jaskin. They've admitted in their briefing to this court that Mr. Jaskin was not designated on the risk utility analysis. He also did no analysis, by the way. So, and then, with respect to the center airplane. He admitted that automobile engineering safety design was outside his area of expertise. Is that right, or is that accurate? That's correct, Your Honor, he did. He disqualified himself from judging the risk utility or the effectiveness of the proposed alternatives. Now, I mentioned before, they didn't propose designs. So, for example, with respect to the center airbag, you have a very intricate dance going on here. You have a lot of violence occurring within milliseconds. You have to look at so many factors. The size of the car, the weight of the car, the size of the occupants, the locations of the occupants, the other safety features. What was their starting position? So, the experts, as I understand it, had not dealt specifically with the 2014 Honda CRV. Correct. There's no test of any of these in a CRV. Again, they couldn't test it because they didn't propose a design. The plaintiff's experts did no testing by admission, and they couldn't do any because they only had a concept. This Court has said conceptual design is not enough. This is not just conceptual. It's used in other—this is not like in the Casey case, though. This is not just theoretical. This is in use in the marketplace right now already. And written about in numerous studies as an existing technology. This is not some conceptual idea that somebody has to say, oh, if you could only do such and such, then maybe. This is already there. So, why doesn't that make a substantial difference in this case? Well, because, again, because of this intricate dance, Mr. Jafsky admitted he had no data about when and where in the crash sequence the heads collided. But Mr. Jafsky is not the expert on this. It's Mr. Hanneman, isn't it? Mr. Jafsky was their accident reconstruction and causation expert, the biomechanic expert. So, he's the one they were relying on to say, how did she get her injury? They didn't rely on Mr. Hanneman to describe when and where in the sequence the heads collided. They were relying on Mr. Jafsky for that. He said he could not do it. He did not have the data. Now, if he couldn't do that, how could the jury possibly do it? To what I said, there's a huge analytical gap here that was never bridged. There's no evidence that all of these things would have come together in the timing sequence and the spatial dimensions to preclude these two young people from hitting heads, both with respect to the reverse seat belt and the center airbag. So, in this intricate dance of a millisecond crash that's very violent, you can't just stand up there and say, well, I think this would have worked. You have to have something to demonstrate it would have worked. These experts did not even try to extrapolate from what little bit of evidence there is about other testing. First of all, some of the testing isn't even described. And the testing that is described is very different from the crash that occurred here. For example, the GM test was a pole test, not a vehicle. Two vehicles colliding at an angle that induced a spin, which adds more complication to the analysis of the crash. So, the so-called tests they rely on do not translate to this particular accident. Honda's own experts said that the center airbag would deploy and fill in about 61 milliseconds. Yes. Why can't the jury rely on that to say that that's before the person would hit the other person? But fill where? Where does it deploy to? And where are the bodies in relation to that fill time? From the lowest part of the seat all the way to the top. Well, then you're talking about a really big airbag. Well, that was what was used in the GM testing, wasn't it? And you're talking about a really big airbag. I didn't pick the airbag. I'm just saying that's what GM. And you're talking about the potential there for inflation-induced injuries when you've got such a big airbag so close to passengers. And Hanneman did not deal with the problem that an airbag like that is going to deflect. Because there's no, what would I call it, reaction surface for that airbag to fill up against and for it to bounce on if an occupant bounces on the airbag. So Mr. Hanneman did not even address that potential for deflection. He simply did not come to any kind of resolution that would show that the center airbag probably would have prevented this head-to-head contact. These alternative seatbelts, is the record, does it include evidence that Honda has used it in an experimental vehicle? Is it in the front or just only in the back? I know that BMW is in the back, but is Honda in the front also? I'll check with my co-counsel. I believe it was in the front seat. Yeah. So Honda itself has the vehicle, has the reverse-engineered seatbelt thing. It was an experimental vehicle. It was never a production vehicle. All right. Thank you, Mr. Stahl. I know you've saved time for rebuttal. Mr. Levinger? Thank you, Your Honor. May it please the Court, I'm Jeff Levinger for the Kims. I think Honda's appellate arguments have gotten so deep in the weeds that they've really lost sight of the bigger points here. First of all, in contrast to many of the cases they cite, we have here a jury verdict to which this Court says it's especially deferential. Second, we have two independent safer alternative designs, and you need only one to uphold the verdict in this case. Third, and this I think goes to some of Judge Yarrow's questions, both alternative designs have been built and tested and installed in production vehicles. They're not concepts. They're not ideas. This is very different from the casing case, which I'll talk about in a moment. These are real products. Even before the jury verdict, though, we have a challenge to the Daubert admission. Correct. And that was an extremely narrow and limited challenge, much more narrow than what they've now expanded to be on appeal. I'll be happy to talk about that if the Court wants. I think Judge Mazzant correctly exercised his broad discretion on that. Was this the traditional kind of Daubert, that these were not the appropriate people? Or what was the Daubert challenge? They didn't challenge their qualifications at all. With respect to Jaguski, Dr. Z, as they call him, it was a pretty narrow challenge. They challenged his so-called risk utility analysis, but it was founded on really the wrong question. They asked him if he'd performed a failure mode effects analysis, to which he said no. Well, Texas law doesn't require a failure mode effects analysis. In fact, I want to refer the Court to the Gini case that was decided in 2015, the year after Casey. Casey didn't have the benefit of Gini. And in Gini, based on extremely weak evidence of a safer alternative design relative to our case, the Court found that the evidence was sufficient to support the jury's finding of a safer alternative design. There was no risk utility analysis of any of the four alternative designs in that case. They also challenged Dr. Z on what they called a better outcome. The element is, is there a reasonable probability of a reduction in injury risk? Notably, their motion— The Texas law doesn't require the risk utility design analysis? It only requires consideration of potential risks in regards to this element. Will there be a substantial impairment in the vehicle's utility through diminution of either usefulness or safety? Gini does not call for so-called risk utility analysis in some formal process. In fact, in Gini, there were four alternative designs. One of them was proposed by the plaintiff's expert in his questions to the defense expert. The plaintiff's lawyer basically opposed it. And the Court held that despite the fact that there seemed to be problems in diminution of usefulness, diminution of safety, the Court called some of the opinions conclusory or ips and dixit, notwithstanding all that, the Court held that the evidence was sufficient to support the jury verdict here. And that's exactly what we have here. And, in fact, in the Sims case, a year after Gini, this Court noted that Gini turned upon the deference given to a jury's verdict, in other words, the same deference we have in this case. Just to complete the point on the DARPA challenge, again, on Saddusky, it's very narrow. The motion didn't challenge his opinion with respect to a better outcome on the reverse geometry seatbelt. It only challenged his opinion on the center airbag. And on that, he said, look, I worked in a complementary fashion with Hanneman, who's an automotive design engineer. And based upon my works, Saddusky's work in accident reconstruction, occupant kinematics, and biomechanics, he said, I can opine and have opined that the center airbag, there's a reasonable probability that it would diminish the injury in this case. But he acknowledged that automobile engineering safety design was outside of his area of expertise. Correct, which is why he worked in tandem with Hanneman, who was the expert on automotive design engineering. Now, as to Hanneman, they didn't challenge in the DARPA motion his opinion about the reduction in injury risk. That element went unchallenged by them as it related to Hanneman. On Hanneman, they challenged the so-called risk utility, but it was despite the expansive argument they now make in their appellate brief, it was one-half page in their motion to exclude, I think, the patient. Hanneman said he had not performed any formal risk utility analysis. He said, well, the question was, in your file, do you have a risk utility analysis? And he said, I've not done a formal risk utility analysis. And if you look at the preceding questions, they were talking about a failure mode effects analysis and that sort of thing. And he said you need a multidisciplinary approach to that. But there's no question that he analyzed the risks, such as they were, with respect to both the center airbag and the reverse geometry seatbelt. In his report and in his deposition, he described the benefits of the reverse geometry belt and the benefits of the center airbag. And he analyzed the risks that were propounded with respect to those. And he said that the risk had been dealt with over time. The risk was not realistic in either the case of the center airbag, which was the so-called inflation-induced injury that the industry has focused on, the government has focused on since the late 90s. And with respect to the reverse geometry belt, he talked about the neck possibility. And that was developed much, much further trial, which I can talk about. There was also a limited challenge to Hanneman on economic feasibility. There was pretrial evidence about the economic feasibility of both designs. He said it as to the belt. And their own corporate representative talked about the center airbag, how it was economically feasible. But then they mooted their own challenge by, on the eve of trial, admitting that they would not contest either economic or technological feasibility. And they did that strategically to prevent us from getting into evidence later developed and installed in one of their own vehicles a center airbag. So that was the basis for their concession. Well, Hanneman said he had no specific conclusion about economic feasibility. Isn't that right? Well, no, that's not right, Judge Smith. He said that with respect to the reverse geometry belt, he said, wait, because you already have – and I'm talking now about the pretrial, the dauber. He said because you have an all-belt-to-seat system, the additional cost of the reverse geometry belt would not be material. It would be next to nothing, I think is what he said. Now, despite their decision not to contest economic feasibility, he then talked about that in detail at trial. And what he specifically said is the center airbag would cost only $20 to $30 per vehicle, and the reverse geometry belt would be only $14 to $15 per seat. And he specifically described how he got his $14 to $15 estimate. He said you're going to have to strengthen the seat. It costs $1 per pound. You're going to have to add about 14 pounds. So that's how you get your $14 to $15. Again, they didn't contest that element. A point about casing, since they're kind of doubling down on casing, it really doesn't help them at all. The case was procedurally distinguishable. That case involved a grant of judgment as a matter of law. Our case never reached a jury. We obviously have a jury verdict to which this court is especially deferential. Factually, the case couldn't be more different than our case. That crash in that case was extraordinarily severe. It involved a vehicle that was driving at a high rate of speed, went off the road, hit a culvert, flew 130 feet in the air at a height of 10 feet, landed, rolled two and three-fourths time, and landed on the driver's side. And she was, unfortunately, ejected out the window. The crash here was, according to the testimony of Mr. Hanneman, well within the parameters that manufacturers test and design for, well within the parameters of the GM testing, well within the parameters of BMW's testing. And other people's testing of the reverse geometry belt. Secondly, in that case, their only alternative design was based on the patent application for a heavier side airbag. It was a mere concept. It had never been installed in any vehicle. In stark contrast to ours, which had been built, installed, and developed and used. The only testing in that case was referred to in the patent application, and it had absolutely nothing to do with the accident. They were dropping a 25-pound weight on top of this airbag material that wasn't even installed in the vehicle. And they were supposed to draw conclusions from that. Well, you couldn't draw any conclusions from that as it related to the terrible accident forces in that case. And furthermore, they didn't make any comparison between the patent application bag and the bag in the subject vehicle. We have those comparisons here. You can look at the GM testing and see the difference between what happens with the airbag and without the airbag. With respect to the reverse geometry belt, they demonstrated how with a conventional belt, a driver will slip out as he moves to the right in a far side crash. In comparison, when you reverse the geometry, it restricts him and restricts his excursion, as they call it, from passenger space. And then, of course, as I said, the Casey case did not have the benefit of Genie, which, to my way of thinking, lowered the bar tremendously when it came to proving safer alternative designs, at least supporting a jury's finding of a safer alternative design. Did Honda waive the argument that it was making today, and I'm going to ask Honda this also, that you had to show that a safer alternative design would also not introduce other dangers of greater magnitude? They did not object to the jury charge that did not include that language and that only talks about substantially impairing the product's utility and doesn't require you to analyze other safety risks of the safety alternative design. I think that's right. I think you measured the evidence against the unobjected to charge, and the charge simply tracked the statute, which talked about is there a reasonable probability, we need that language, it's important, that there be a substantial impairment in the product's utility. It doesn't say in that you must have, without other dangers of equal or greater magnitude. That was not part of the charge that the jury was charged with, and the charge was not objected to. Correct. They did argue, I think, in the motion for new trial that the court erred. That's in the motion for new trial, but they never argued that at the time of the charge conference. Correct. In judgment. And he said that. They waived that argument. And he said, look, all I did was I quoted the PJC, the pattern jury charge, which in turn quotes the statute when it comes to safer alternative design. And as to the substantial impairment point, there really wasn't any substantial impairment to be had with respect to the center airbag. There wasn't any suggestion that it would affect utility or usefulness. As Mr. Haneman said, it just sits there doing nothing until it's deployed. They did. The only purported safety risk is this inflation-induced injury that they talked about. And yet, Mr. Haneman said, based on testing that's been done from GM and based on the industry's focus on this since about 1998, he said, inflation-induced injury is not a realistic concern. I mean, you've got airbags coming out of the front, the side, and now the center. And inflation-induced injury is not a concern because the government has mandated that these bags be depowered to deal with that. So that's not a realistic risk. In fact, their own expert, Mr. Klima, agreed that inflation-induced injury was not terribly concerning to him in so many words. And, in fact, he said the sophistication of this technology, referring to the airbag technology, is remarkable. That's what their own expert said about the technology. That's the record page 3412 and 3385. And as to whether— Should the court be concerned that there wasn't direct testing of this specific vehicle as part of these experts' preparation? I mean, I think nowadays they have these accident reconstruction centers that have every vehicle possible tested. So is this unusual that there's not the specific testing on this vehicle? And should that concern the court and give us pause?  In Jeanne, the court said that a design need not even be built and tested. It only needs to be capable of being produced. Here we've gone beyond that. We have a design that—I'm talking now about both designs here. They have been built, they have been tested, they have been installed. GM's test— What district did you tell us that was? I'm sorry? Jeanne Court. Where is that? That's a Texas Supreme Court case. Oh, it's Texas Supreme Court. Yes, Jeanne v. Maytek. It's cited in the brief. I'm sorry. I thought it was from a court of appeals in Texas. No, no, no. Texas 2015 462 Southwest 31 is the site for that case. Okay. Thank you. Was there discussion at trial about the failure to test as to a similar vehicle, a Honda CRV? Was that discussed before the jury, number one? Number two, was it discussed during the Daubert hearing? Neither, Judge Smith. The airbags were tested by GM in crossover vehicles. They have three of them now. Okay. But specifically to my question, so you're saying that Honda never brought it to the courts or the jury's attention about the failure to test on a Honda CRV? I'm sure their experts probably mentioned it, but the problem was I don't think the distinction was material because nobody testified that the CRV was any different materially from the crossover vehicles in GM. And in respect to counsel's point, yes, there were proposed specific alternative designs. Mr. Haneman said, look, what I'm proposing is the same airbag design that GM is using for its three crossover vehicles. For its crossover vehicles, very similar to the CRV, same type of configuration. And he talked about how the center console would act as a reaction surface and provide some robust structure to the bag, which was all part of his testimony about how the bag would indeed have made a difference. It would have deployed and would have been deployed and inflated within about 61 milliseconds. That came from their experts. The evidence showed that the driver wouldn't even start moving toward the passenger until about 100 milliseconds. So it would be out in time. There's no question about that. Haneman described how the bag would wrap around the driver on his right side, that it would provide a cushion, a cushion just long enough to do what it had to do, which was to stop him from moving into the passenger space and creating head-to-head contact. It's not hard to picture. It's a very simple prospect. And unlike Casey, which involved this horribly severe accident, the configuration and severity of this accident were well within the parameters that people test for. In fact, their own sled test, Honda sled test that they conducted, which they said is the only test that replicates this accident, actually showed the driver moving, deflecting forward of the bag and being in a position where he would not hit the driver, the passenger's head. He would only hit maybe the knee or the leg. So in that case, in that sense, this case is exactly like Jim versus Bury, which involved a similar situation where the design, the court said, even with the safer alternative design, she still might have hit the B pillar, but she would have hit it with less force and not sustained a traumatic brain injury. So in that sense, it would have significantly reduced the risk of injury. And I want to make one other point. They quote what they call a disclaimer of effectiveness. On page 78 of their brief, and then they talk about it again on page 37 of the reply, and they attribute that to GM. GM disclaimed the effectiveness of their own bag. I want to be clear, that was not GM's disclaimer. That disclaimer came from colleagues of their own expert, Mr. Carhart, who was employed by Exponent. That was their so-called disclaimer, and it was based on testing they did in December of 2020 after Mr. Carhart had been retained by Honda. Let me interrupt you just to ask you one more thing while you have time. Will you address the issue about the presumption of non-liability? Yeah, I'd be happy to. I think on that one, Judge Mazam really did a masterful job on it. He started with the right question. That is, what is the product risk that is alleged to have caused the harm here? We have to focus on the plaintiff's allegations. And he followed Kia versus Ruiz to a tee, and I don't know that I have time really to get into Kia versus Ruiz. It's in the brief. But as it applies to this case, Honda made the same argument essentially that Kia did in that case, which was, well, the product risk is the risk of injury to side impact. And Judge Mazam correctly said, no, that's not the product risk here because there's no complaint about the functioning of the side structure, the door, the side curtains. No complaint about that. The product risk is the risk of injury due to the failure to adequately restrain the movement of the far side occupant, in this case the driver, in a near side collision. That is the product risk. And everybody agreed here, including their experts and their corporate representative, that there is no FMVSS, no federal regulation that governs that product risk of the movement of a far side occupant that can cause a near side injury. All right. And your time has expired, Mr. Levenger. Thank you. Thank you. Mr. Stolle, you've saved some time for rebuttal. Thank you, Your Honor. The safety devices that were already in the market were never tested under these accident conditions. And there is no evidence that the experimental Honda vehicle was ever tested in any form or fashion. Hanneman admitted that the one test for center airbag, the GM test, did not correlate to these accident conditions. So what you have just said, was that pointed out either at the Daubert hearing or before the jury or both? I believe so, but I'm sorry, I can't tell you exactly where, Your Honor. I know that Honda's very good trial lawyers were all over the fact that these devices were never tested under the same conditions. Hanneman also admitted that the only test that did attempt to stimulate the accident conditions was the Honda test, which, by the way, was a test involving the GM airbag because Honda had no design from the plaintiffs that they could test. And the Honda test showed that the driver missed the airbag. The reverse seatbelt was never tested by anybody under the conditions of this accident. The BMW article with the reverse seatbelt in the back seat, the article says they did some tests, but the tests aren't described. And the other article they use that has testing for a reverse seatbelt were rollover tests. Rollover tests are very different. As one of the experts described, in a rollover accident, the time sequence is longer because you're rolling over. And so there's what they call more time to, quote, ride down the forces. So it's a very different test that doesn't correlate. Hanneman never tried to bridge the gap between the GM test and this accident, between any of the other tests in this accident. And there's no evidence. What would have happened under these accident conditions with the reverse geometry seatbelt? I'm so sorry because you're talking about the Hanneman had these tests, but I thought one of the very first questions I asked you was, was that in either the Daubert hearing or the trial were these other tests and these other studies and all of these things in the record? And I thought you told me they weren't. And so I'm very confused now. And I'm sorry for the confusion, Your Honor. The limited record at Daubert may not have any of that, but there was a lot of testimony about the demonstrative exhibits used at trial that either didn't describe the testing or described testing that was very different from the accident conditions. Okay. What do you say about the Kia case? On the presumption of non-liability? Yes. The Supreme Court in that case laid down two markers. They laid down one marker that said, when does the presumption not apply? It didn't apply in that case. They also laid down a marker when the presumption does apply. And the marker they laid down there was, if the complaint is about safety features that NHTSA does not require, then the presumption applies. And here they are complaining about safety features NHTSA does not require. So Kia actually describes the situation where the presumption does apply here as a matter of law. What is your best case for the proposition that the relevant product risk to be analyzed should be the broader risk of far side impact? That's not our position, Your Honor. It's not? Okay. Our position is the risk category is side impacts. Nothing about far side or near side, it's side impacts. Only side. So FMVSS 214 governs the risk of injury and side impacts. Where we think Judge Mazant went wrong in his legal analysis was, he took that category of risk and he sliced it into an injury mechanism. Now, you can take any category of risk and hypothecate any number of injury mechanisms from that category of risk. There is no way NHTSA can regulate, can write a regulation that covers every potential injury mechanism from a given category of risk. Would you like to address the Genie Industries v. Maytek case that's been discussed extensively by your friend on the other side? The one thing I remember from that case is the Supreme Court did say that there was enough evidence to support a risk utility analysis there. I don't think the evidence here raises to that level. None of the experts couldn't even address the major risk inherent to the reverse seatbelt. All right, thank you, Mr. Stoll. Your time is expiring. Your case is under submission.